UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERA A. HOUSTON,

                CASE NO. 14-14426

     *Plaintiff*,

                DISTRICT JUDGE JOHN CORBETT O'MEARA
*v.*                MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to undersigned for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381 *et seq*. The matter is currently before the Court on cross-motions for summary judgment. (Docs. 13, 14.)

Plaintiff Vera A. Houston was fifty-seven years old when she applied for benefits on October 21, 2011, alleging that she became disabled on June 1, 2010. (Transcript, Doc. 11 at 132.) Her employment history includes secretarial work and caregiving for a family member. (Tr. 174.) At the initial administrative stage, the Commissioner considered whether she was disabled by discogenic and degenerative back disorders and affective disorders (Tr. 89.) The impairments, alone or combined, were not found to be disabling. (*Id.*) Plaintiff asked for a hearing in front of an Administrative Law Judge ("ALJ"), who would consider the application de novo. (Tr. 95-97.)

ALJ Jerome B. Blum convened the hearing on February 22, 2013. (Tr. 35-67.) In his decision filed in June 2013, the ALJ found that Plaintiff was not disabled. (Tr. 23-31.) The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on September 26, 2014, when the Appeals Council denied Plaintiff's request for review. (Tr. 1-3.) On November 18, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

### B.     Standard of Review

Applicants for Social Security benefits go through a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff

can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court does not "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th

Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

4

*See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at

353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-85. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the

6

impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since October 21, 2011, the application date. (Tr. 25.) At step two, the ALJ concluded Plaintiff had the following severe impairments: "degenerative disc disease,

hypertension and swelling of the bilateral lower extremities" (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. 26.) The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of sedentary work, as defined in the regulations, 20 C.F.R. §§ 404.1567(b), 416.967(b). (Tr. 26-29.) With that limitation, the Plaintiff could perform her past relevant work as a reception clerk. (Tr. 29.) Additionally, the skills she had acquired in that past work could transfer to a significant number of other jobs in the national economy. (Tr. 30.)

### E.     Administrative Record

#### 1.     Medical Evidence

The medical records begin with Plaintiff in a relatively healthy condition. In June 2010 she started treating at St. Clair Shores Medical Hospital. (Tr. 221.) The initial paperwork she completed states that she had "no medical problems," past hospitalization or surgeries, and her only current medication was methadone. (Tr. 221-22.) The forms also indicate that she occasionally engaged in vigorous exercise, she smoked but did not drink alcohol, she lived with others, and she did not experience frequent falls or hearing or vision loss. (Tr. 222-23.) Regarding her mental health, she claimed that stress was not a "major problem," she was not depressed, she did not panic when stressed, her appetite and eating habits were under control, she did not cry frequently, and she had never been suicidal; she did, however, have trouble sleeping and had been to a counselor in the past. (Tr. 223.) She asserted that the only generalized pain she experienced related to

withdrawal from methadone. (Tr. 225-26, 237.) She asserted that her withdrawal pain was "as bad as you can imagine," but presently it rated at seven-out-of-ten on a visual analog ("VA") scale. (*Id.*) It moderately interfered[1] with her daily life, though she had not received treatment for it. (Tr. 226.)

At a January 2011 appointment with Dr. Bernard W. Shelton, she claimed to experience "pain all over," again attributing it to medication withdrawal. (Tr. 237.) The examination notes mention joint pain but state she had no arthritis, back pain, joint swelling, muscle cramps, muscle weakness, or stiffness. (*Id.*) Moreover, she was not depressed or suicidal, and had no other psychiatric impairments. (*Id.*) Nonetheless, when they met a month later she reported that the "medications are working for pain" and the notes do not indicate that she was experiencing continued discomfort. (Tr. 238.) The examination again found no arthritis, joint pain or swelling, muscle cramps, muscle weakness, or stiffness. (*Id.*)

The following session, in March 2011, Plaintiff added back pain to the list of problems, and also mentioned increased appetite. (Tr. 239.) The examination again uncovered no arthritis, joint swelling, muscle cramps, weakness, or stiffness. (*Id.*) But now, according to Plaintiff, her medical history included arthritis and degenerative joint disease. (*Id.*) The back pain continued into April, and neck pain developed as well. (Tr. 240.) Otherwise her condition remained the same; there were few complaints or health concerns mentioned in Dr. Shelton's sparse notes. (*Id.*)

---

[1] On a VA scale, with "0" representing no interference and "10" representing complete interference, Plaintiff selected six for all measures, which included general activity, mood, normal work, sleep, enjoyment of life, ability to concentrate, and relationships with others. (Tr. 226.)

Dr. Shelton's report from May 2011 is more substantial, including a long list of symptoms that he checked off as inapplicable. (Tr. 219.) The only relevant conditions he marked were tachycardia, or a rapid heart rate, and back pain. (*Id.*) He crossed off all other musculoskeletal, neurological, and psychiatric symptoms, such as weakness, falling, joint pain, limited range of motion, neck pain, depression, and anxiety. (*Id.*) And, on the preprinted portion of the notes, he did not circle either "DJD," degenerative joint disease, or "OA," osteoarthritis. (*Id.*) In June, back pain remained the only health concern mentioned, and Plaintiff did not suffer from arthritis, joint pain, joint swelling, muscle cramps or weakness, or stiffness. (Tr. 241.)

Dr. Shelton's September 2011 notes expand Plaintiff's roster of problems and complaints. (Tr. 215.) In place of back pain, which was not selected from the preprinted options, Plaintiff had fatigue, headaches, joint pain, neck pain, and tachycardia; her medical history now included hypertension, osteoarthritis, and anxiety. (Tr. 216.) Her chest was normal. (*Id.*) The nearly illegible handwritten notes appear to state that Plaintiff felt anxious, but in the "Review of Systems" portion including the other symptoms, Dr. Shelton did not select anxiety as a current problem. (Tr. 215-16.) The October notes, however, include anxiety as a current issue, along with appetite problems, back pain, and the other symptoms listed the prior month. (Tr. 213-14.) Her chest was again normal. (*Id.*)

Around the same time, Dr. Shelton completed a "Medical Examination Report" for the state agency handling disability benefits. (Tr. 188.) Plaintiff's then-current

10

diagnosed impairments included degenerative joint disease, osteoarthritis, hypertension, and degenerative disc disease; her "History of Impairment(s) and Chief Complaint(s)" were chronic back pain and anxiety. (*Id.*) Next, he circled various symptoms and limitations she experienced. (Tr. 189.) The import of his comments in this section of the form is not immediately apparent. He circled words in a portion of the form that does not seem to request or require comment—the "Examination Areas," listing systems of the body and possible symptoms—and scarcely wrote anything in the "Report" section that asked him to "Report finding in detail . . . and comment on etiology of findings or report/provide objective studies and evidence that support those findings." (*Id.* (emphasis removed).) Under the first "Examination Area," Dr. Shelton circled only fatigue, omitting other impairments to dressing, stance, ability to move, and pain levels. (*Id.*). Yet, in the accompanying "Report" section he merely wrote that she had difficulty dressing and undressing. (*Id.*) In the "Examination Area" for respiratory problems, he circled wheezing, rales, and shortness of breath, but he left the accompanying "Report" section blank. (*Id.*) In the musculoskeletal portion, he did not circle any of the symptoms and indicated that an ambulatory aid was not medically required. (*Id.*) He wrote that her straight leg raise test was positive, and that her arms and legs had a limited range of motion. (*Id.*) There was also evidence of a neurological disorder or a neurological deficit that resulted from a back impairment; but none of the evidence is discussed, and instead all that Dr. Shelton wrote to flag this issue was "yes" to both parts of a conjunctive

question. (*Id.*) Dr. Shelton also recorded that Plaintiff's condition was deteriorating and that she could not meet her "needs in the home." (*Id.*)

On February 15, 2012, Plaintiff had an appointment with Dr. Shelton. (Tr. 210, 242.) After running out of her medication, her pain had increased. (*Id.*) The notes suggest that in addition to back pain and stiffness she had chills, weakness fatigue, anxiety, and depression. (*Id.*) However, she was not experiencing chest pain, edema, weakness, or any other symptoms. (*Id.*) Dr. Shelton observed that Plaintiff "look[ed] depressed" and was "having some dificuly to walk [sic.]." (Tr. 242.) The only abnormal findings were limited motion, muscle spasms, arthritis, a mildly stooped gait, poor insight and judgment, and mildly impaired remote and recent memory.[2] (Tr. 243.) Dr. Shelton did not list any treatment plans, except that she was to return in one month, and his assessment only included diagnoses of anxiety, depression, epilepsy, obesity, spondylogenic compression of the lumbar spinal cord, and malignant hypertension. (Tr. 211, 243-44.)

When Plaintiff saw him again on March 14, 2012, she reported that the back pain had improved, and the purpose of her visit was to get her blood pressure checked. (Tr. 208, 245.) Dr. Shelton listed her blood pressure but made no comment about it. (Tr. 209.) Two sets of notes exist describing this session, the first set apparently coming from Dr. Shelton's office and the second set from St. Claire Shores Medical hospital. (*Id.*) They largely overlap, but a few potentially significant differences exist. In the first set, for example, she had no chills, while the second set lists chills as one of her symptoms. (*Id.*)

---

[2] There are two sets of notes from the February appointment. (Tr. 210, 242.) The second set contains more detailed findings, with additional observations and diagnoses. (Tr. 242-43.) The latter records do not directly contradict anything from the first, less extensive, set of notes.

The first set reports that Plaintiff's neurological system was not weak (Tr. 208); the second set reports neurological weakness. (Tr. 245.) More importantly, the first set states that she suffered from back pain, muscle weakness, and stiffness, but did not have arthritis, joint pain or swelling, or muscle cramps. (Tr. 208.) The second set, however, includes arthritis as one of her conditions and does not mention muscle weakness. (Tr. 245.) Regarding her psychiatric state, the first notes claim she has anxiety and depression but not memory loss, mental disturbance, or suicidal ideation; (Tr. 208) the second set simply includes the diagnoses of anxiety and depression. (Tr. 245.) The second set also includes physical examination results, which are left out of the first set of notes. (Tr. 246.) She appeared "in some significnt [sic] distress," had limited motion, muscle spasm, arthritis, a mildly stooped gait, abnormal speech, neurologic weakness and atrophy, poor judgment, mildly impaired recent and remote memory, and she seemed to have a "very high level o [sic] depression," Dr. Shelton concluded, adding that she rearely [sic] smiles." (*Id.*)

In March 2012, Plaintiff had two consultative examinations in connection with her disability benefits application. (Tr. 190-203.) In the first, addressing her physical condition, Plaintiff stated that her blood pressure was high, but that after a previous clinic visit she started medication, she had no history of chest pain or heart disease, and she had never gone to the emergency room or been hospitalized as a result of her hypertension. (Tr. 195.) Walking thirty minutes fatigued her, but she did not become short of breath (*id.*) and she denied general fatigue (Tr. 196.) She also reported smoking seven cigarettes

13

per day. (Tr. 195.) Her back pain began three years ago when she was taking care of her mother, though she "only saw a doctor one and a half years ago" and an x-ray of her back returned "negative." (Tr. 195.) "The pain occurs mostly when she gets up early in the morning. It gets better during the day." (*Id.*) She also related that her ankles would swell if she stood "too long." (*Id.*)

During the physical examination, Dr. Ernesto Bedia uncovered "[n]o sign of respiratory distress," crackles, or wheezes. (*Id.*) Nor did she appear to have kyphosis, scoliosis, back spasms, or point tenderness in her back. (*Id.*) Her straight leg raise test was negative. (*Id.*) Her arms and legs were similarly normal, as was the neurological examination. (Tr. 196-97.) Notably, she walked with stable gait and successfully completed toe, heel, and tandem walks. (Tr. 197.) Dr. Bedia also noted that her blood pressure was within normal limits, her reflexes were intact, she could "bend down completely" while standing, she had full range of motion in her back and ankles, and she did not have leg edema. (*Id.*) Attached to the report are the results from a lumbar spine radiological test, revealing "minimal degenerative osteoarthritic changes of the lumbar spine" and minimal narrowing of two intervertebral disc spaces. (Tr. 198.) Dr. Bedia's session notes are included, showing the multiple neurological and orthopedic tests Plaintiff completed, none of which caused her difficulty. (Tr. 199-202.)

The second consultative examination addressed her mental status. (Tr. 190-193.) At the session, Plaintiff "complained of feeling very sad and despondent since she lost three family members in 2009 including her mother, a nephew, and a cousin." (Tr. 190.)

While her grief persisted, she had not sought psychiatric treatment, though her primary physician prescribed Valium as a sleep aid and referred her to a psychiatrist. (*Id.*) Nonetheless, she felt "the primary reason she is unable to return to work would be her lower back pain and difficulty standing and walking for long periods." (*Id.*) She last worked full time ten years ago, as a secretary. (*Id.*) She quit to take care of her ailing mother, which she did until 2009. At the time of the examination, Plaintiff's adult daughter supported her. (*Id.*) She lived with that daughter and two grandchildren, preparing meals for them and doing light household chores. (Tr. 191.) Her relationships with family members were good, she adequately handled personal grooming and hygiene, she relied on her daughter for transportation, her sleep had improved with medication, her appetite was normal, and she enjoyed watching her granddaughter play basketball. (*Id.*)

According to the examiner, Dr. Nick Boneff, a licensed psychologist, Plaintiff appeared "neat and clean" and attentive to her grooming, walked without support, sat comfortably, and was pleasant but serious and reserved. (*Id.*) She denied having ever felt "hopeless, overwhelmed, or having thoughts of harming herself." (*Id.*) After a series of tests, Dr. Boneff concluded that Plaintiff was "not currently evidencing any significant psychiatric symptoms, depression, anxiety, or problems with memory or concentration that would prevent her from doing work related activities at a sustained pace." (Tr. 192.) Additionally, she was "generally independent with her [activities of daily living], getting along well with family and friends, and help[ed] to care for her young grandchildren." (*Id.*) Dr. Boneff assigned a Global Assessment of Functioning score of 60 to 65,

indicating mild to moderate symptoms. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).[3] Her prognosis was fair and she could manage any funds received through disability benefit payments. (*Id.*)

In April 2012, Dr. Kathy Morrow reviewed the psychiatric records and determined that Plaintiff's mental impairments were not severe. (Tr. 86.) Plaintiff had only mild restrictions in activities, mild difficulties in social functioning, and mild difficulties maintaining her concentration, persistence, and pace. (*Id.*) Dr. Morrow concluded that Plaintiff's physical problems, not her mental or emotional issues, explained most of her limitations in activities of daily living. (*Id.*)

Also in April, Plaintiff returned to Dr. Shelton, complaining that her back hurt "sometimes" and that she needed her blood pressure checked. (Tr. 206, 248.) Like the previous visit to Dr. Shelton, this one produced two sets of notes. (*Id.*) In the first, she had no chills or fatigue (Tr. 206); in the second she experienced both. (Tr. 248.) Also differing are the reviews of musculoskeletal and neurological systems. In the first, she had back pain "[s]ometimes," but no arthritis, join pain, joint swelling, muscle cramps, muscle weakness, or stiffness (Tr. 206.) She had no neurological symptoms, including no weakness. (*Id.*) The second set states that she had back pain (with no qualification that it occurred "sometimes") and stiffness, and she had neurological weakness. (Tr. 248.) Similarly, the first set lists anxiety as her only psychiatric symptom, asserting that she was "[n]egative for . . . Depression, Hallucinations, Memory Loss, Mental Disturbance,

---

[3] The most recent edition of this text, however, rejects the use of these scores. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed., 2013).

Paranoia, [and] Suicidal Ideation." (Tr. 206.) The second set lists anxiety and depression, and does not mention the other symptoms. (Tr. 248.) The physical examination report, attached to the second set, states that Plaintiff appeared "in some mild distress," had limited musculoskeletal motion, muscle spasm, arthritis, mildly stooped gait, poor insight and judgment, mildly impaired remote and recent memory, and depression. (Tr. 249.)

Plaintiff's June 2012 visit to Dr. Shelton also resulted in conflicting sets of notes.[4] (Tr. 204, 250.) In the first, her chief complaint was "back pain and joint pain in [her] knees." (Tr. 204.) The second says that the reason for the visit is to check blood pressure, and that her back pain was improving. (Tr. 250.) Likewise, the first set ruled out almost all symptoms in every area, except for back and joint pain; she had no fatigue, no psychiatric issues, and no neurological problems. (Tr. 204.) The second set's physical examination results contain the same findings as described in the previous notes from April. (Tr. 251.)

No dual sets of notes exist for the final visits. On June 30 she came into Dr. Shelton's office complaining of a severe cough. (Tr. 252.) Her back, she reported, was feeling better with the medication. (*Id.*) She had chills and fatigue, arthritis, back pain, stiffness, anxiety, depression, and neurological weakness; she did not have joint pain or swelling, muscle weakness, or chest pain. (*Id.*) The examination results mirror those from the previous visit; even the respiratory system notes state "[n]o abnormal findings." (Tr. 253.) For the first time in his reports, Dr. Shelton offers details of the session and the

---

[4] In all of the conflicting sets, the quantifiable measurements did not conflict. Thus, for example, both sets from the June appointment list the same weight, temperature, body mass index, respiration rate, and blood pressure. (Tr. 205, 251.)

reasons for his assessments. Regarding her depression, he wrote that she continued discussing her mother's death. (*Id.*) Her epilepsy had not caused any seizures within the past month despite not taking any medication. (*Id.*) Her blood pressure was better controlled, but Dr. Shelton wrote that Plaintiff needed to show more consistent compliance with her medications. (Tr. 254.) Finally, he noted that the back pain was treated with medication and that Plaintiff "could benefit from some physical therapy if she could get it paid for." (*Id.*)

In September 2012, she told Dr. Shelton her back pain had improved and that she complied with the medication regime to treat it. (Tr. 255.) Her blood pressure was under control when she took her medication. (*Id.*) Her respiratory infection had resolved, and Dr. Shelton observed that she "seem[ed] to be doing better with her pain, but her blood pressure is surely in need of more control." (*Id.*) The review of her systems and physical examination results were generally consistent with the prior reports; Dr. Shelton again added a neurological section noting Plaintiff's abnormal speech and weakness. (Tr. 256.) Despite feeling depressed "at time[s]," she was doing "ok" with Xanax and made no request for an increased dosage. (Tr. 257.) Her blood pressure, while high during this appointment, did "show more control while she is on her medication." (*Id.*) Dr. Shelton encouraged her "to do non weight bearing exercises, shuch [sic] as floor exercises and swimming," to help her back pain. (*Id.*)

The October session notes are nearly identical to those from September. (Tr. 258.) Dr. Shelton added that Plaintiff continued to refuse antidepressant medications and made

18

no requests to increase her Valium prescription. (Tr. 260.) He repeated his recommendation that she exercise and attend physical therapy to aid her back. (*Id.*) At the next session, in November, she again claimed that her back had improved with medication. (Tr. 262.) However, her cough had returned. (*Id.*) Otherwise, the notes nearly replicate those from the prior months. (Tr. 262-64.) Her depression centered around her mother's death, her seizures were under control, her blood pressure was managed but she need more consistency with her medication, and her back could benefit from physical therapy. (*Id.*) The cough persisted into the following month, when she returned to Dr. Shelton. (Tr. 265.) Again, she repeated that her back still hurt but had improved after taking medication. (*Id.*) The notes mirror those from the past few months. Dr. Shelton added that her elevated blood pressure was caused by inconsistent medication use: "She is obviously not taking her medication as she should," he reported, "since at times it is much better." (Tr. 267.)

In January 2013, she complained to Dr. Shelton that her back and joints ached. (Tr. 269.) This time, in addition to back pain, stiffness, and arthritis, Dr. Shelton included muscle cramps and weakness and joint pain and swelling in his review of systems. (*Id.*) She was no longer fatigued. (*Id.*) The notes lack any narrative discussion of her current complaints. In March, she continued to complain of lower back and joint pain, but the notes indicate she no longer experienced arthritis, joint swelling, or neurological weakness. (Tr. 272.) She reiterated in April that medication helped her back pain; the notes from her session with Dr. Shelton state that she again had joint swelling and

19

arthritis, in addition to her nagging pain, stiffness, and muscle weakness. (Tr. 274.) At the last recorded appointment, in May, she complained of renewed fatigue and arthritis. (Tr. 276.) Nonetheless, she did not have joint pain, joint swelling, muscle cramps or weakness, stiffness, depression, or memory loss. (*Id.*)

### 2.   Adult Function Reports

In November 2011, Plaintiff filled out an adult function report as part of her disability benefits application. (Tr. 157-64.) The first question asked what illnesses limited her ability to work. (Tr. 157.) She responded, "Mostly the physical problems I have with my back—such as bending over, and [I] don't try to lift anything anymore." (*Id.*) Additionally, she "seem[ed] to be distracted with worries more and more." (*Id.*) On a typical day, she prepared breakfast for her grandchildren and watched them depart for school; then she washed dishes, dusted, and swept. (Tr. 158.) Later, she would watch television or read, followed by ironing her grandchildren's school clothes for the next day. (*Id.*) Until her daughter arrived home from work, Plaintiff "mainly care[d]" for her two grandchildren. (*Id.*) Prior to her illness, she was more active and social. (*Id.*) Her sleep, however, generally remained unaffected unless worries plagued her, and she had no problems with personal care, such as dressing or bathing. (*Id.*) Nor did she need reminders to take care of personal needs or take medicine. (Tr. 159.)

She prepared three meals per day, usually cereal, toast, grits, or sausage for breakfast, salads or soup for lunch, and a more elaborate dinner, such as meat and potatoes. (*Id.*) Her back pain did not change her cooking habits. (*Id.*) Among the

household chores she was responsible for were sweeping, washing dishes, and putting clothes in the washer and dryer. (*Id.*) Her granddaughter carried the clothes basket upstairs, and they would fold together. She ironed clothes every day. (*Id.*) She did not need help or encouragement to complete these tasks, but chores were easier when her granddaughters assisted. (*Id.*) She did no outdoor work. (Tr. 159-60.)

Three times per week she would take walks, though in the cold weather her granddaughter would only accompany her once per week. (Tr. 160.) She did not leave the house often, only to visit relatives occasionally; more often, people visited her since she could not drive. (*Id.*) She also traveled by walking, and could do so alone; she usually did not, however, because of "bad incidents" in her area. (*Id.*) Her daughter did the shopping online. (*Id.*) Handling finances presented no problems for Plaintiff, and her illnesses had not affected her financial abilities, though she had no bank account and her daughter paid the bills. (Tr. 160-61.)

For recreation, she read, watched television, and played video games. (Tr. 161.) Her family remained "very close," and she stayed in touch with her friend by telephone since they lived "so far away." (*Id.*) She did not belong to social groups and had not been to church in two years. (*Id.*) With friends and family she talked, laughed, and played games; she always enjoyed her time with them and felt very comfortable around them. (*Id.*)

From a list of abilities, Plaintiff selected the following which her conditions impaired: lifting squatting, bending, reaching, kneeling, and stair climbing; left

unselected were, among others, standing, walking, sitting, memory, task completion, concentration, understanding, following instructions, and getting along with others. (Tr. 162.) Her house contained two sets of stairs, and usually she sent her granddaughters when she needed something on another floor. (*Id.*) When she walked, she would stop every five or ten minutes to rest. (*Id.*) She found herself distracted only when her mind was preoccupied with worries; and she generally handled stress poorly, but she was working on reducing stress. (Tr. 162-63.) Following instructions and relating well to authority figures were not problems, and she was learning to adjust to changes in her routine. (Tr. 163.) Asked if she had developed any unusual fears or behaviors, she wrote that the news increasingly distressed her. (*Id.*)

### 3.   Administrative Hearing

ALJ Jerome Blum convened the Plaintiff's administrative hearing on February 22, 2013. (Tr. 35-67.) Plaintiff's representative began by asking for additional time to update her medical records, noting that Dr. Shelton's reports were forthcoming. (Tr. 38.) She characterized Dr. Shelton as Plaintiff's only treating physician. (*Id.*) She lacked health insurance and did not qualify for government assistance, Plaintiff testified, so her daughter paid Dr. Shelton's bills. (Tr. 40-41.)

Plaintiff stated that her last job occurred around 2000, as a secretary, a position that included typing and operating a computer. (Tr. 38.) Currently, she did not own or use computers, and said she did not know how they worked. (Tr. 60-61.) She quit to take care of her mother, who first needed a cane to walk, then used a walker, and then was

bedbound. (Tr. 39.) After she passed away in 2009, Plaintiff did not seek work because she felt "too nervous," a condition that she said was her "main problem now." (Tr. 40.)

Along with anxiety, her lower back hurt, apparently related to her time caring for her mother, who weighed over 300 pounds and whom Plaintiff needed "to turn." (Tr. 41.) She never lifted her mother, but used a sheet to turn her while her mother held onto the bed rails. (Tr. 59.) Additionally, Plaintiff's ankles would swell, but she could not always "get" the medicine that counteracted it. (Tr. 41.) Medication also brought her blood pressure down, but she did not currently have any of the medication. (Tr. 41-42.)

She also repeated her statements from the function report that personal care posed no problems for her. (Tr. 42.) At home, her bedroom was upstairs, and while she could ascend the steps, her knee usually hurt when doing so. (Tr. 43.) Explaining her chores at home, she said she washed only the towels, not clothes, and that once per week her granddaughter carried the basket of dirty towels downstairs to the washer, which Plaintiff would load, start, and then transfer to the dryer. (*Id.*) She washed dishes by sitting at the sink, and did not know whether she could do it while standing. (Tr. 44.) She swept the floors but did not use a dustpan, so she avoided bending down during chores. (*Id.*)

Her daughter did the shopping and ran all errands, as Plaintiff had no driver's license, letting it lapse twenty years ago when she became too nervous to drive. (Tr. 45.) Plaintiff's only consistent routine outside the house was visiting the doctor once per month. (*Id.*) The ALJ pressed her on why she did not shop in grocery stores; she responded that she did not "want to be in the . . . store" because of "the people." (Tr. 46.)

23

Cooking, however, was something she did every day. (*Id.*) Usually, she awoke at 6:00 a.m., reminded the younger granddaughter to wash before school, had the children's clothes ironed and laid out for them, and watched the older granddaughter get on the school bus. (Tr. 47-48.)

After everyone left the house, she often heard "things," perhaps from next door although it seemed to come from inside. (Tr. 48.) She tried calming herself by reading, but frequently found herself stuck reading the same page over and over, and growing more anxious. (*Id.*) She kept television on at a low volume so that she did not hear the news. (Tr. 49.) The older granddaughter regularly arrived home from school first, and Plaintiff had food waiting for her. (*Id.*) When she the bus was late, Plaintiff would grow nervous. (*Id.*) Friends and family occasionally visited, but not often since they lived far away; Plaintiff visited them on the holidays. (Tr. 50.)

Plaintiff had no problems sitting, and did not like standing in one spot even though she could stand and stare out the blinds "for a while." (Tr. 51.) She also paced around the house, as she heard different noises. (*Id.*) As this occurred, she estimated that she could stand for "15 minutes or . . . even longer." (*Id.*) She often lifted and carried cartons of milk, but never tried lifting anything heavier. (Tr. 52.) Her hands and arms were not weak, and she could open jars and raise her arms over head. (Tr. 52-53.) She slept seven to eight hours per night, never waking tired or taking naps during the day. (Tr. 54.)

Asked to rate her pain, she said that without medication it was intense enough to cause her to "hunch[] over" in pain," probably about an eight out of ten on a VA scale.

(*Id.*) With medication, "it starts going away to where it's down way lower," though her back always seemed to "pull" her. (*Id.*) Even so, with the medication the pain ebbed to two or three on a VA scale, a point at which, she said, "I can do everything that I need to do." (Tr. 55.) Lisinopril, her blood pressure medication, adequately controlled her blood pressure, but she could not afford it during the past month. (*Id.*)

Generally, she said, financial issues prevented her from buying more than one medication at a time. (*Id.*) However, she did take her pain medication and, in fact, frequently did not need the full prescription. (Tr. 56.) The medication did not cause side effects. (*Id.*) Her anti-anxiety medication worked, though she still became nervous and she did not want to become reliant on it. (Tr. 56-58.) She also had a prescription to help reduce the swelling in her feet and ankles. (Tr. 57-58.) Her attorney asked why she could not work full time. (*Id.*) "I'm nervous about everything and I get distracted," she replied, and "it's getting worse." (*Id.*) She needed to see a therapist but her "daughter can't afford that." (*Id.*)

The vocational expert ("VE") then testified that Plaintiff's former secretarial jobs would generally be considered sedentary and semi-skilled, but Plaintiff's long absence from such employment would cause her to struggle with current computer software. (Tr. 61-62.) Essentially, Plaintiff would be "starting from scratch" and would need at least thirty days to become familiar with the new software. (Tr. 62.) Her typing skills, however, would have remained intact. (*Id.*) The ALJ then asked how many secretarial

jobs like those she worked in existed locally in Detroit and across the state. (Tr. 63) There were around 14,000 positions as general receptionists locally and 60,000 statewide. (*Id.*)

The ALJ then asked whether these secretarial positions were available to a person with Plaintiff's symptoms, "especially when she can't for financial reasons take her medication" and her pain was at level eight on a VA scale, her blood pressure was high, and her legs and feet swelled. (Tr. 63-64.) No, the VE concluded, the high pain level would affect her concentration. (Tr. 64.)

The ALJ then explained his view of the present case, stating that Plaintiff could not afford to take her medications consistently, but if she could, it seemed that she would be able to perform her prior work. (*Id.*) The attorney declined to comment, saying "that is basically it." (Tr. 65.) Acknowledging that the consultative examiners found "only minor" physical limitations, the attorney added that they should hold less weight than Dr. Shelton's opinion, derived from consistent treatment. (Tr. 65-66.) The ALJ agreed that "there's credibility here" and he "believe[d] her," explaining that "I understand that she's very credible, sincere, and I'm sure the conditions are sincere, but we have to deal with the lack of medication and the effect of it." (Tr. 66.)

### F.    Analysis and Conclusions

#### 1.    Legal Standards

The ALJ determined that Plaintiff had the RFC to perform the full range of sedentary work. (Tr. 26.) Such work

> involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary

26

job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.  Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff contends that the ALJ committed at least two reversible errors. First, she asserts that "the substantial evidence on the record demonstrates that controlling weight was not given to the claimant's treating sources." (Doc. 13 at 10.) By this, she means that the ALJ should have given controlling weight to the findings of Dr. Shelton, the lone treating source. (*Id.* at 10-12.) Continuing under the same argument, Plaintiff diverges into various other contentions not strictly related to treating source law. She criticizes the ALJ's "complete lack of consideration" regarding her inability to pay for medical

27

treatment, which implicates the credibility analysis. (*Id.* at 11-12.) Further, she says the ALJ failed to consider whether she could sustain a competitive work week, as required by SSR 96-8p. (*Id.* at 13.)

Next, she comes to her second argument, which really consists of two separate contentions. The first part attacks the RFC. Plaintiff seems to assert that the ALJ did not incorporate into the RFC the severe impairments he found at step two, never explained Plaintiff's functional limitations, never evaluated her pain or symptoms, and failed to adequately address why her anxiety was not severe. (*Id.* at 14.) Additionally, she claims that "the ALJ never discusses or evaluates Ms. Houston's subjective complaints" under the proper regulatory format. (*Id.* at 14-15.) None of these arguments merit reversing the ALJ or remanding the case.

### a.       Medical Sources and Treating Physicians

### i.       Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, including "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For

28

example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant,  "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c). The regulations do not prescribe any similar test for opinions from "other sources." SSR 06-03p, 2006 WL 2329939, at *3. Nonetheless, both the Sixth Circuit and the Commissioner

29

require ALJ's to apply the factors to "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[5] and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818

---

[5] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to

31

safeguard the claimant's procedural rights." *Cole*, 661 F.3d at 937. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

### ii.   Analysis

Plaintiff contends that the ALJ did not offer substantial evidence for devaluing Dr. Shelton's opinion. (Doc. 13 at 11.) Rather, she contends that the ALJ "cherry pick[ed]" the record and pointed only "to strange facts within the records that he twists and turns in an attempt to somehow pain Plaintiff in a bad light." (*Id.*) As the only example of this, Plaintiff points to the ALJ's assertion that Dr. Shelton based his opinion largely on Plaintiff's subjective complaints. (*Id.*; Tr. 28.) Hoping to catch the ALJ contradicting himself, Plaintiff notes that the ALJ also acknowledged Dr. Shelton had Plaintiff perform straight leg raise tests that "objectively" indicated decreased range of motion. (Doc. 13 at 11; Doc. 11 at 28.) Thus, she implies, Dr. Shelton relied on objective evidence. Plaintiff's only other relevant arguments are that the ALJ did not consider an x-ray, taken during a consultative examination, when discussing Dr. Shelton's opinion, and that he did not properly consider Plaintiff's inability to pay for medical treatment. (Doc. 13 at 11-12.) The latter contention will be addressed below in the credibility section.

The parties do not dispute Dr. Shelton's status as a treating physician. Therefore, the ALJ needed to provide "good reasons" for rejecting Dr. Shelton's opinion. I suggest

that he has, and that none of Plaintiff's arguments germane to the treating source opinion justify reversal or remand. Plaintiff never specifies which of Dr. Shelton's statements the ALJ should have granted controlling weight to, and how these opinions would have resulted in an RFC that rendered her incapable of substantial gainful employment. The closest Dr. Shelton came to issuing an opinion on Plaintiff's functional limitations was in the "Medical Examination Report" form she completed. (Tr. 188.) Relying on that form, however, is problematic. Like his other notes, it does not offer a concrete set of limitations. Rather, it concludes that Plaintiff cannot meet her "needs in the home." (Tr. 189.) This does not readily translate into meaningful limitations, such as the amount of weight she could lift or hours she could sit and stand.

Assuming, however, that it represented Dr. Shelton's opinion that Plaintiff functions under severe limitations, the ALJ still found "good reasons" for rejecting it. (Tr. 28.) As the ALJ pointed out, Dr. Shelton's records do not contain many results from objective testing, and the straight leg raise test in the "Medical Examination Report" is not replicated in any of the treatment notes. (*Id.*) Further, the sections of the treatment notes that mention her mobility restrictions are vague. (*Id.*) Usually, they list stiffness, pain, limited motion, and mildly stooped gait. (Tr. 204, 208, 243, 246, 248-49, 251-76.) Dr. Shelton never explained how he verified these conditions, such as with the type of extensive testing Dr. Bedia employed.

Likewise, the notes predating Dr. Shelton's "Report" do not provide solid support for his conclusions. At their first session, she related her complaints of pain to medication

33

withdrawal, and the notes mention only joint pain; she did not have arthritis, back pain, joint swelling, muscle weakness, or stiffness." (Tr. 237.) When she next returned, she reported that the medications helped ease her pain. (Tr. 238.) Over the following months, the notes indicate she experienced back and neck pain, but still did not include muscle weakness, joint swelling, or stiffness. (Tr. 239-40.) And in one of the last sessions before he completed the "Report," he included only cardiovascular issues and back pain as current conditions, crossing off other musculoskeletal and neurological symptoms, including weakness and mobility limitations. (Tr. 219.) At the final two appointments prior to Dr. Shelton's "Report," the notes indicate increased issues with pain and fatigue, but provide poor groundwork for the eventual assertions in the "Report."

More importantly, as the ALJ observed, Plaintiff consistently discredited the statements appearing in Dr. Shelton's "Medical Examination Report." (Tr. 28.) The "Report" is somewhat ambiguous regarding Plaintiff's ability to keep up her personal care. He did not select many of the impairments on the form's list that would implicate this area; for example, he circled fatigue but not difficulty dressing, problems with her stance, struggles with pain, or inability to "move about." (Tr. 189.) In the section next to this list, where he was supposed to explain his reasoning with objective evidence, he simply wrote she had difficulty dressing and undressing. Not only did he not circle this as an issue, but his treatment notes do not mention problems dressing. In her Function Report, Plaintiff denied needing any assistance with personal care, such as dressing. (Tr. 158.) Additionally, far from asserting that she cannot function at home, Plaintiff reported

34

that she actually contributed to the everyday care of her two grandchildren by cooking, ironing clothes, seeing them off to school, helping with the laundry, washing dishes, and sweeping.[6] (Tr. 42-44, 46, 158-59.)

Similarly, Dr. Shelton's "Report" lists, again without explanation, respiratory issues. (Tr. 189.) While Plaintiff later came to him with colds on a few occasions (Tr. 252, 262, 265), this problem had not yet manifested when he completed the "Report" and, in any event, was not a serious issue that Plaintiff relied upon when asserting her disability. Instead, in her Function Report she said her back pain was the relevant condition impairing her ability to work (Tr. 157), and at the hearing she said her "main problem now" was anxiety. (Tr. 40.) Dr. Shelton also reported fatigue (Tr. 189); but elsewhere she denied general fatigue (Tr. 196), and the records indicate only intermittent complaints of it. (Tr. 204, 206, 210, 216, 242, 252, 269, 276.)

The rest of the Dr. Shelton's "Report" is too flimsy to support, without more, Plaintiff's disability claim. He circled two cardiovascular conditions but failed to provide any supporting detail. (Tr. 189.) In the musculoskeletal section, he simply noted the straight leg raise test and placed a downward arrow next to "ROM," an acronym for "range of motion. (*Id.*) This brief observation stands as the only meaningfully objective test result mentioned in Dr. Shelton's records. The ALJ could not reasonably use this insubstantial evidence to construct an RFC that would result in finding Plaintiff disabled.

---

[6] Referencing these daily activities is not an attempt to inflate their importance or suggest they establish her ability to work. *See Barker-Bair v. Comm'r of Soc. Sec.*, No. 1:06-CV-00696, 2008 WL 926569, at *11 (S.D. Ohio Apr. 3, 2008) ("It is well recognized that a claimant's ability to perform limited and sporadic tasks does not mean she is capable of full-time employment."). Rather, they are important here because they contradict Dr. Shelton's opinion.

To do so, he would have to intuit the functional limitations entailed by the straight leg test results, and would have to guess at just how much her range of motion had decreased. Dr. Shelton's "Report" provides insufficient information to make these leaps.

In contrast to Dr. Shelton's vague conclusions supported by sparse notes, Dr. Bedia's report provides the only comprehensive functional testing results in the record. The ALJ properly relied on this report (Tr. 28), which included findings strongly indicating that Plaintiff is not disabled. Plaintiff told Dr. Bedia that her back pain decreased throughout the day. (Tr. 195.) During the physical examination, Dr. Bedia failed to uncover any abnormalities: notably, her blood pressure was stable and her musculoskeletal system was normal, including a straight leg raise test. (Tr. 195-97.) He attached comprehensive results showing the tests Plaintiff completed, none of which presented any particular challenge. (Tr. 199-202.)

Dr. Bedia also provided x-ray results showing "minimal degenerative osteoarthritic changes of the lumbar spine" and minimal narrowing of two intervertebral disc spaces. (Tr. 198.) Plaintiff gripes that the ALJ did not consider this evidence in conjunction with Dr. Shelton's opinion. But this misses the mark. First, Dr. Shelton did not use the x-ray to develop his opinion, and thus it could not support his explicit reasoning. Nor would it greatly bolster Dr. Shelton's vague assertions. The x-ray indicates only minimal degeneration and whatever issues it demonstrated did not prevent her from achieving full mobility during her tests with Dr. Bedia, who did not raise any concerns with the x-ray results. (Tr. 198.)

36

A few notes list Dr. Shelton's observations under the heading, "Exam," including his observations of Plaintiff's limited mobility. (Tr. 243, 246, 249, 251, 253, 256, 259-60, 263, 266-67.) Citing these records, the Commissioner concedes that the ALJ overstated his case when he claimed that Dr. Shelton lacked objective support for finding that Plaintiff had a limited range of motion. (Doc. 14 at 15 n.2; Tr. 28.) The Commissioner characterizes this as a harmless error (Doc. 14 at 15 n.2), and if it is an error, it is one that the Plaintiff did not raise. The potential error here was in ignoring roughly two lines of text, repeated in a few treatment notes: "Musculoskeletal: Limited Motion :- Muscle Spasm :- Arthritis :- Gait & Station : mild stooped gait" (Tr. 243, 246, 249, 251, 253, 256, 260, 263, 266), and "Neurologic: Abnormal Speech :- Abnormal Gait :-Weakness Atrophy :- Cranial Nerves: II-XII grossly normal." (Tr. 246, 256, 260.) The ALJ does not seem to have passed over these records completely, as his decision lists them among the evidence he considered (Tr. 34), and he cited to these records in his decision. (Tr. 27.)

Moreover, as discussed above, the notes themselves are confusing. From the February 2012 visit until the first visit in June 2012, the record contains different sets of notes with contradictory information for each appointment. For example, for the March 14 visit, one set of notes state, under the "Review of Systems," that she had muscle weakness but not arthritis, while the other set says she had arthritis and does not mention muscle weakness. (Tr. 208, 245.) The "Exam" portions only appeared in one set of notes and, with a few slight variations in her general appearance, they were identical in each session. Those "Exam" notes ended in December 2012. (Tr. 266-67.) The reports

covering the following six months, the final ones in the record, include no "Exam" results. (Tr. 269-77.) In that half a year's worth of sessions, the "Review of Systems" portion of the notes indicates that she had no neurological symptoms, including no weakness, and her musculoskeletal symptoms varied. (*Id.*) On a few occasions her back and joints hurt, her joints were swollen, and she had muscle weakness and stiffness. (Tr. 269, 274.) More often, however, she experienced only some of these symptoms, and the notes frequently said she was "[n]egative for" arthritis and joint swelling. (Tr. 272.) On some occasions she only experienced back pain (Tr. 276), and almost all of the notes, even those with "Exam" results, reported that her back pain had improved with treatment. (Tr. 238, 245, 248, 250, 252, 255, 258, 262, 265, 274.)

Thus, the ALJ did not cite to one set of alternative notes containing cursory examination results that were invariably the same. If this was an error, I suggest it was harmless. Because Dr. Shelton is a treating source, harmless error can only be found if (1) his "opinion is so patently deficient that the Commissioner could not possibly credit it," (2) the ALJ adopted the opinion or made findings consistent with it, or (3) the ALJ "met the goal of § 1527." *Wilson*, 378 F.3d at 547. The Sixth Circuit has also found harmless an ALJ's failure to discuss a treating physician's three-page summary of a claimant's medical history where the report lacked supporting objective evidence, was generated prior to the disability onset date, and where the ALJ incorporated its limitations into his hypothetical to the VE. *Heston v. Commissioner of Social Security*, 245 F.3d 528 (6th Cir. 2001).

Under any course, the exceptions are narrow, but I suggest that in this case they apply. As pointed out above, Dr. Shelton advanced no opinion that translates into meaningful functional limitations the ALJ could use in the RFC. His only effort to comment on Plaintiff's capabilities was his conclusion, made by checking a preprinted form box, that Plaintiff cannot meet her needs at home. But as demonstrated, Plaintiff herself refuted this idea. By discrediting Dr. Shelton for his lack of objective evidence, the ALJ did not undercut any medical opinion that, if adopted, would qualify Plaintiff for benefits.

Nor do the "Exam" results themselves offer any such opinion, or even provide enlightening information on Plaintiff's condition. Under the regulations, the RFC seeks to gauge an applicant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. §§ 404.1545(a)(4), 416.945(a)(4). The observations here, in contrast, merely state she had pain, limited mobility, spasms, an abnormal gait, a "mild stooped gait," arthritis, and weakness. Some of these are diagnoses rather than discrete symptoms limiting her capacity to work. Moreover, numerous records from Dr. Shelton, stretching throughout his treatment of Plaintiff, found no arthritis. (Tr. 206, 208, 219, 237-39, 241, 272.) The observations of her gait are also uninformative, for they do not measure how difficult walking is for Plaintiff or provide any estimate of her capability to walk in a work environment. A few related notes reference her difficulty walking, but these seem to come from Plaintiff  (Tr. 242, 255, 258), as the ALJ noted (Tr. 28), and are somewhat undercut by Plaintiff's statements stating she could walk up to 30

minutes, that she generally walked every week, and that she avoided walking due to incidents in the neighborhood. (Tr. 160, 196.)

In any event, the "Exam" results that the ALJ failed to discuss do not establish functional restrictions or provide enough information to help develop such restrictions. Nor do they even suggest how Dr. Shelton derived the results, unlike Dr. Bedia's report, which lists a bevy of exams and the accompanying results. The existence of Dr. Bedia's opinion in the record further distinguishes the present case from others that refused to find harmless error because the ALJ could not point to evidence contradicting the discredit treating source opinion. *See, e.g.*, *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 862 (6th Cir. 2011) (refusing to find harmless error where "there [were] no countervailing or contradictory medical opinions to which the ALJ pointed in support of his wholesale rejection of the treating physicians' opinions"); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) (refusing to find harmless error where the ALJ "discussed no opinions contrary to that of [the rejected treating source] other than that of the reviewing physician.") Here, the ALJ properly relied on Dr. Bedia's comprehensive findings to reject Dr. Shelton's reports.

Under these circumstances, the ALJ "met the goal of § 1527." *Wilson*, 378 F.3d at 547. The Sixth Circuit has explained that an ALJ can meet the goals of 20 C.F.R. 404.1527(d) by, for example, his or her analysis of the treating source's other opinions or by his or her analysis of the impairment at issue. *See Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (discussing, *Hall v. Comm'r of Soc. Sec.*, 148 F. App'x

40

456, 464 (6th Cir. 2005)). Through such analyses, the ALJ might adequately, though indirectly, attack the supportability or consistency of the disputed opinion—and by showing flaws in its supportability or consistency, the ALJ will have met the purposes behind 20 C.F.R. §§ 404.1527(d)(3), (4). *Id.* "Thus the procedural rule is not a procrustean bed, requiring an arbitrary conformity at all times." *Friend*, 375 F. App'x at 551. It suffices if "the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion." *Id.*; *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 ("Violation of [the 'good reasons'] rule constitutes harmless error if the ALJ has met the goals of the procedural requirement—to ensure adequacy of review and to permit the claimant to understand the disposition of his case—even though he failed to comply with the regulations terms.").

Here, as discussed above, the ALJ's analysis meets the regulatory goals. To the extent Dr. Shelton offered a discrete opinion, the ALJ adequately questioned its supportability by citing Plaintiff's own statements contradicting key portions of that opinion. (Tr. 28.) Further, he highlighted its inconsistency with the remainder of the record, in particular Dr. Bedia's report containing detailed objective findings. (*Id.*) The presence of "Exam" results in a few of Dr. Shelton's notes does not diminish the cogency of the ALJ's total analysis, and the contradictions between the opinion and both Plaintiff's statements and Dr. Bedia's findings are still apparent. *Accord Dickey-Williams v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 792, 805 (E.D. Mich. 2013) (finding harmless

error under this exception where the ALJ's reasoning was still apparent and meaningful review was still possible).

If the underlying purpose of harmless error analysis in general is to prevent needless remands, it difficult to imagine that an ALJ on remand will read the line, "Musculoskeletal: Limited Motion :- Muscle Spasm :- Arthritis :- Gait & Station : mild stooped gait," repeated multiple times, and be swayed to adopt Dr. Shelton's stance that Plaintiff struggles to meet her needs at home. *See Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010) ("If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time."). As that was Dr. Shelton's only real opinion, it is equally difficult to believe that this vague line of text would provide an ALJ on remand sufficient information to tinker with the RFC. Plaintiff has provided no argument, for example, that "Limited Motion" entails any particular restriction not already encompassed in the RFC. Consequently, because the ALJ met the regulation's goals, and because the potentially overlooked basis for Dr. Shelton's opinion adds no discernable value to Plaintiff's case, I suggest that any error was harmless.

Additionally, to the extent the "Exam" results do suggest severe restrictions, the RFC does much to accommodate them by limiting Plaintiff to sedentary work, which requires only occasional (that is, less than one-third of the workday) standing and walking. None of Dr. Shelton's notes suggest Plaintiff has problems sitting. In fact, while

her Function Report mentioned some trouble with sitting, she testified at the hearing that sitting was not an issue. (Tr. 51, 162.) She added that she frequently stood and paced at home for "15 minutes or . . . even longer." (Tr. 51.) According to Dr. Bedia's notes, she could walk 30 minutes before feeling fatigued. (Tr. 195.) Further, in her Function Report she indicated that she regularly walks, avoiding it only due to "bad incidents" in the areas. (Tr. 160.) In an early medical record, she indicated that she occasionally engaged in vigorous exercise. (Tr. 222.) Thus, even reading harsh restrictions into Dr. Shelton's open-ended notes, the ALJ accounted for the issues Dr. Shelton flagged and meets *Wilson*'s second exception.

I suggest that the ALJ's analysis provided "good reasons" for rejecting Dr. Shelton's opinion, and that any errors were harmless. To the extent Dr. Shelton offered a discrete opinion, it is too vague to provide concrete functional restrictions, it lacks support from Dr. Shelton's own notes, and it is contradicted by both Plaintiff and the most detailed objective evidence in the record.

### b.    Competitive Work Schedule

In her section discussing Dr. Shelton's opinion Plaintiff adds, almost as an afterthought, that the ALJ never evaluated "whether claimant is capable of a competitive work schedule i.e., 8 hour day, 40 hour work week," as required by SSR 96-8p. (Doc. 13 at 13.) The argument could fairly be considered waived, as Plaintiff simply block quotes the Ruling and states, "This was simply never done by the ALJ in his decision. The ALJ slanted and even outright misstates the evidence in his decision." (*Id.*) Then she cites a

43

few cases for the proposition that courts can determine whether an ALJ's decision is "arbitrary, capricious, or an abuse of judgment." (*Id.*) How did the ALJ twist the evidence? Plaintiff does not say. How would such twisting relate to the competitive work schedule? Plaintiff again does not address this. And how does any of this relate to Dr. Shelton's treating source opinion? Again, Plaintiff leaves the reader guessing. This justifies finding the argument waived, but it fails on the merits as well.

### i.  Governing Law

SSR 96-8p requires ALJs to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)." SSR 96-8p, 1996 WL 374184, at *7 (citation omitted). The RFC, however, "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis," which is a forty-hour work week. *Id.* at *2 (emphasis omitted). The evaluation of a claimant's physical and mental abilities aims to "assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). Thus, generally, the RFC implicitly encompasses this finding, *see Mynhier v. Astrue*, No. 10-cv-037, 2010 WL 3245394, at *7 (E.D. Ky. Aug. 16, 2010), although some courts hold that the ALJ must still explain his or her reasoning. *See Stanfield v. Colvin*, No. 2:12-cv-213, 2013 WL 3935071, at *6-7 (E.D. Ky. July 30, 2013)

Most courts do not require any discussion. Instead, they find that an RFC implicitly includes the determination on whether the claimant can sustain a regular work schedule. As one explained, "Generally, such a finding is implicit. There is no requirement to make an explicit 'regular and continuing basis' finding evidence of a waxing and waning nature of the claimant's symptoms." *Thomas v. Comm'r of Soc. Sec.*, No. 1:03-CV-925, 2005 WL 588752, at *6 (E.D. Tex. Jan. 3, 2005).[7]

---

[7] *See also Beckham v. Colvin*, No. 8:13-2774, 2015 WL 733785, at *11 (D. S.C. Feb. 20, 2015) ("Thus, the RFC is, by definition, an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."); *Bowers v. Colvin*, No. 11-40229, 2014 WL 3530781, at *10 (D. Mass. Mar. 12, 2014) (noting that there is no requirement the ALJ explicitly make this determination and finding that the ALJ implicitly made the finding), *Report & Recommendation adopted by* 2014 WL 3530797 ("The record evidence establishes the ALJ *implicitly* considered Bowers's ability to sustain her activities."); *Raley v. Astrue*, No. 2:11cv555, 2012 WL 2368609, at *6 (M.D. Ala. June 21, 2012) ("Thus, in creating a RFC assessment for Plaintiff, the ALJ has implicitly reached a determination on whether or not Plaintiff can perform those work activities during an eight-hour day."); *Ramirez ex rel. Zetino v. Astrue*, No. 10-CV-03522, 2012 WL 372011, at *22 n.31 (E.D. N.Y. Feb. 3, 2012) ("Thus, in determining that Zetino retained the capacity to 'perform the full range of light work . . .' the ALJ implicitly found that Zetino could perform such work on a sustained basis."); *Ricks v. Comm'r of Soc. Sec.*, No. 2:09cv622, 2010 WL 6621693, at *14 (E.D. Va. Dec. 29, 2010) (Report & Recommendation) ("As defined, any assessment of a claimant's RFC is necessarily an assessment of the claimant's ability to work a forty-hour week."); *Mynhier*, 2010 WL 3245394, at *7 (noting SSR 96-8p's definition of RFC and concluding, "Thus, implicit in an ALJ's RFC finding was the ALJ's determination that [the claimant] could perform light work on a 'regular and continuing' basis and not merely for a short period of time"); *Clark v. Astrue*, No. C09-5342, 2010 WL 842322, at *9 (W.D. Wash. Mar. 8, 2010) (adopting Report & Recommendation) ("It is axiomatic that the residual functional capacity finding is inherently an assessment of a claimant's ability to perform ongoing work."); *Porter v. Astrue*, No. 08-CV-33, 2009 WL 2595562, at *15 (D. Ore. Aug. 19, 2009) (adopting Report & Recommendation) ("Because Porter did not explain his argument, this court relies upon a plain reading of SSR 96-8p and finds that the ALJ implicitly considered Porter's ability to work eight hours per day, five days per week."); *but see Martin v. Astrue*, No. 6:08-3006, 2010 WL 890064, at *10 (D. S.C. Mar. 8, 2010) (noting the contrary authority, binding authority from the Fourth Circuit but simply holding, without elaboration, that those cases "do[] not excuse the ALJ's failure to comply" with the Ruling); *Brodbeck v. Astrue*, No. 5:05-CV-0257, 2008 WL 681905, at *8 (N.D. N.Y. Mar. 7, 2008) (remanding where the ALJ's only acknowledgement of the workday limitation came by giving great weight to a medical source's opinion concerning how much the claimant could lift in a normal day); *Mardukhayev v. Comm'r of Soc. Sec.*, No. 01-CV-1324, 2002 WL 603041, at *6 (E.D. N.Y. Mar. 29, 2002) ("In addition, I conclude that the ALJ did not determine, explicitly or implicitly, whether the claimant had the capacity to work on a 'regular and continuing basis.'").

Many other courts give the ALJs significant leeway in satisfying this ruling. The Fourth Circuit has found that an RFC limiting the claimant to a "'a wide range of sedentary work" at production rate or simple tasks "implicitly contained a finding that Mr. Hines physically is able to work an eight hour day." *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). Likewise, the Fifth Circuit has held that an "ALJ's determination that [the claimant] had the RFC to perform sedentary work is a determination that he is able to sustain work-related activities on a 'regular and continuing basis'" under the SSR 96-8p. *Pekrul v. Barnhart*, 153 F. App'x 329, 332 (5th Cir. 2005); *see also Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (holding that the ALJ did not need to make "a specific finding that the claimant can maintain employment" where there was no evidence that this ability was "compromised despite [the claimant's] ability to perform employment as an initial matter" and no "indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC").

Even courts demanding more thorough discussions have allowed broad assertions in the decision to fulfill this requirement. In *Stanfield v. Colvin*, the court held that the ALJ "must still explain [his or her] determination" that the claimant can perform full-time work. 2013 WL 3935071, at *6-7. Nonetheless, it was sufficient that the ALJ mentioned the claimant's part-time work, he "regurgitated" a doctor's assessment and other third-party statements, and the plaintiff pointed "to no additional evidence to suggest she could not perform in the limited capacity the RFC details on a full-time

46

basis." *Id.* Similarly, in *Scott v. Commissioner of Social Security*, the ALJ's consideration of the claimant's "past experience with various ailments" and his references to an eight-hour workday sufficed to meet the Ruling. No. 11-13545, 2012 WL 4178844, at *3-4 (E.D. Mich. Sept. 19, 2012).

### ii.      Analysis

Under any of the approaches listed above, the ALJ satisfied SSR 96-8p's requirements. The ALJ found that Plaintiff can perform a full range of sedentary work. (Tr. 26.) Two circuits have held that such a finding satisfies SSR 96-8p. *See Hines*, 453 F.3d at 563; *Pekrul*, 153 F. App'x at 332; *Dunbar*, 330 F.3d at 672. Even applying the slightly more rigorous requirements from *Stanfield* and *Scott*, the ALJ's discussion suffices. Plaintiff has not cited any evidence suggesting she cannot manage a competitive work schedule. *Accord Stanfield*, 2013 WL 3935071, at *6-7. The ALJ also noted Plaintiff's past full-time work, and that it terminated "not because of her alleged impairments," but because Plaintiff began taking care of her mother. (Tr. 27.) His determination that she could currently perform this work implicitly indicates that he considered the demands of a full work schedule. (Tr. 29.) Therefore, I suggest he complied with SSR 96-8p.

### c.      Credibility Analysis

### i.      Governing Law

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the

credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

   (i)    [D]aily activities;

   (ii)   The location, duration, frequency, and intensity of . . . pain;

   (iii)  Precipitating and aggravating factors;

   (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

   (v)    Treatment, other than medication, . . . received for relief of . . . pain;

   (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are

to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

### ii.     Analysis

Plaintiff lodges his first credibility argument when discussing Dr. Shelton's opinion. In his decision, the ALJ found that the "infrequent, routine and conservative nature of the claimant's treatment" suggested that the severity of her impairments was not as great as she alleged. (Tr. 29.) This constitutes "a significant legal error," Plaintiff asserts, because Plaintiff's indigency explains why she did not seek more treatment, the ALJ "was very aware of the Plaintiff's inability [to pay for] treatment," the "regulations clearly state that indigency must be considered," and the ALJ completely disregarded this factor. (Doc. 13 at 11-12.) To the contrary, I suggest that the ALJ followed the Ruling requiring him to consider indigency.

It is a Social Security Ruling, not a regulation, that requires ALJ to consider a claimant's ability to pay.[8] SSR 96-7p states that a claimant's credibility may be diminished if "the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." 1996 WL 374186, at *7. Before drawing any inferences from such a failure, however, the ALJ must "first consider[] any explanations that the individual may provide" accounting for the inconsistent treatment. *Id.* Among the possible explanations the Ruling lists is that the "individual may be unable to afford treatment and may not have access to free or low-cost medical services." *Id.* at *8.

The Ruling does not prevent an ALJ from properly rejecting claims from indigent claimants who have not pursued treatment. It simply requires the ALJ to show that he considered the rationale and did not place undue emphasis on the lack of treatment. *See Messina v. Colvin*, No. 3:12-CV-150, 2013 WL 4852328, at *11 (E.D. Tenn. Sept. 10, 2013) (finding no error where the ALJ noted that the plaintiff "had not had surgery and could not afford such surgery" and did not appear to discount the plaintiff's credibility because of the lack of surgery); *see also Tate v. Comm'r of Soc. Sec.*, No. 2:13-cv-11473, 2014 WL 4536929, at *7 (E.D. Mich. Sept. 11, 2014) (adopting Report & Recommendation) ("[T]he ALJ's narrative indicates that she did not place great weight

---

[8] *See Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 272 n.1 (6th Circ. 2010) ("Social Security Rulings do not have the force and effect of law, but are 'binding on all components of the Social Security Administration' and represent 'precedent final opinions and orders and statements of policy and interpretations by the Commissioner. 20 C.F.R. § 402.35(b)(1).").

on Tate's non-compliance."). And there may still be other reasons for finding that such claimants are not credible. *See Henry v. Comm'r of Soc. Sec.*, 973 F. Supp. 2d 796, 803 (N.D. Ohio 2013) (noting the Ruling but stating, "if other evidence in the record suggests the claimant is not credible, the ALJ should be able to reject the claimant's explanation").

For example, in *Boothe v. Commissioner of Social Security*, the court found the ALJ did not err by discounting the claimant's credibility for lack of treatment even though the plaintiff claimed indigency. No. 1:06-CV-00784, 2008 WL 281621, at *11-13 (S.D. Ohio Jan. 31, 2008) (adopting Report & Recommendation). It sufficed that the ALJ questioned the claimant about his lack of treatment, and wrote in the decision that he did not find Plaintiff credible. *Id.* The court also pointed out that the claimant had not provided documentation supporting his "claimed poverty," such as evidence he was denied access to free or subsidized medical services. *Id.* As the Seventh Circuit has noted, "An absence of evidence that a claimant sought low-cost or free care may warrant discrediting his excuse that he could not afford treatment." *Buchholtz v. Barnhart*, 98 F. App'x 540, 546 (7th Cir. 2004) (citing *Osborne v. Barnhart*, 316 F.3d 809, 812 (8th Cir. 2003)).

Further, the claimant in *Boothe* continued to smoke cigarettes and drink alcohol, which the Court found inconsistent with his indigency. 2008 WL 281621, at *12. Many other courts similarly have noted that the ability to pay for cigarettes undercuts a plaintiff's claim that he or she cannot afford medical treatment. *See, e.g.*, *Rise v. Apfel*, 234 F.3d 1269, 200 WL 1562846, at *2 (6th Cir. 2000) (unpublished table decision)

("[A]lthough she consistently stated that she could not afford the appropriate medications, she was able to afford cigarettes."); *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (noting that while claimant stated that he could not afford prescribed support hose, he could afford cigarettes). In other cases, ALJs permissibly discounted the claimants' credibility when the evidence showed that the claimants failed to adhere to medication prescriptions even when they admitted having received the medications. *See, e.g.*, *Tate*, 2014 WL 4536929, at *7 ("But the record reflects that Tate was not compliant with medication even when she had financial coverage for it."); *Battice v. Comm'r of Soc. Sec.*, No. 1:12-CV-1389, 2014 WL 1366489, at *2 (W.D. Mich. Mar. 31, 2014) (adopting Report & Recommendation) ("[T]he Magistrate Judge correctly concluded that the ALJ relied on medical testimony that Plaintiff had not followed the prescribed course of treatment, even when he was given medication and had it in his possession, unopened.").

In contrast, ALJs violate the Ruling only when they disregard the claimant's alleged indigency, or point to no other countervailing evidence. The ALJ in *Johnson v. Commissioner of Social Security* committed these errors. No. 13-12139, 2014 WL 4724751, at *3-4 (E.D. Mich. Sept. 23, 2014). There, the medical records contained numerous references to the plaintiff's inability to afford treatment. *Id.* at *3. The ALJ nonetheless discounted her credibility for lack of treatment without questioning her at the hearing and without any indication in his written opinion that he considered her indigency. *Id.* at *3-4. The medical records in *Stennett v. Commissioner of Social*

*Security* likewise noted that the plaintiff was discounting physical therapy due to cost. 476 F. Supp. 2d 665, 673 (E.D. Mich. 2007) (adopting Report & Recommendation). The ALJ's failure to consider this rationale was an error. *Id.* Even in such cases, the error may be harmless where the ALJ cites to other substantial evidence, such as the plaintiff's statements or "the absence of evidence of serious functional limitations" in the medical records. *Kittelson v. Astrue*, 362 F. App'x 553, 558 (7th Cir. 2010); *see also Davis v. Astrue*, No. 08-122, 2009 WL 2901216, at *1 (E.D. Ky. Sept. 3, 2009) (adopting Report & Recommendation) ("[T]he ALJ's failure to consider Davis's ability to afford medical treatment was a harmless error because the ALJ based Davis's credibility on various factors, not just on Davis's lack of frequent medical treatment.").

Here, the ALJ sufficiently considered Plaintiff's indigency, and while he cited the conservative nature of her treatment as a reason to discount her credibility, he supported his credibility assessment with substantial evidence. The strongest argument Plaintiff could make—which she does not clearly make—is that at the hearing the ALJ seemed to credit Plaintiff's complaints of disabling pain without medication. (Tr. 66.) The ALJ's subsequent decision does not cast doubt on Plaintiff's impecunious circumstances, and he only cites to Plaintiff's conservative treatment when discussing her credibility. (Tr. 29.) Therefore, because he provided no reason to doubt her pain level or her poverty, he provided no reason to doubt her at all.

This argument fails for multiple reasons. Starting with the medical records, Dr. Shelton's reports flag Plaintiff's noncompliance with her blood medication (Tr. 254,

54

264), but unlike cases finding ALJ error, the records do not disclose why she was noncompliant. *Cf.*, *Johnson*, 2014 WL 4724751, at *3-4; *Stennett*, 476 F. Supp. 2d at 673. A later note complaining of continued noncompliance was written with more vehemence: "Her blood pressure today is really elevated. She is obviously not taking her medication as she should since at times it is much better." (Tr. 267.) He then informed her of the permanent damage this could cause. (*Id.*) This episode might suggest that her compliance varied with her ability to pay for medications. But if so, Dr. Shelton seemed unaware of this explanation. And on at least one occasion, after Dr. Shelton found that her blood pressure was "very elevated," Plaintiff admitted that she could not remember if she took her medication that day despite having refills of the medication. (Tr. 260.)

The only reference to her finances is Dr. Shelton's note that Plaintiff "could benefit from some physical therapy if she could get it paid for." (Tr. 254, 264, 267.) At other times, the notes mention physical therapy but no longer include the qualification "if she could get it paid for." (Tr. 260.) This may suggest financial struggles, but neither it nor any of the other records provide the sort of direct corroboration important to the analyses in cases reversing the ALJ. *See Johnson*, 2014 WL 4724751, at *3-4; *Stennett*, 476 F. Supp. 2d at 673. Nor did she produce documentation demonstrating her attempts to obtain low cost or free services.[9] *Cf.*, *Buchholtz*, 98 F. App'x at 546*; Boothe*, 2008 WL

---

[9] The medical records also indicate Plaintiff smoked roughly half a pack of cigarettes per day. *See, e.g.*, (Tr. 238, 277.) While she stated that her daughter paid bills, such as Dr. Shelton's, it is uncertain who purchased the cigarettes. (Tr. 40-41, 45, 160-61.) This could suggest she had the financial ability to pay for additional treatment. *Cf. Rise*, 234 F.3d 1269, 2000 WL 1562846, at *2; *Sias*, 861 F.2d at 480; *Boothe*, 2008 WL 281621, at *12. However, relying on this observation risks creating an impermissible *post hoc* rationalization for the ALJ's decision that the ALJ did not put forward. *See generally Hill v. Comm'r of*

281621, at *12. Additionally, the ALJ complied with SSR 96-7p by elaborating on Plaintiff's financial plight at the hearing and in his written decision. . (Tr. 27, 64-66.) *Cf. Messina*, 2013 WL 4852328, at *11; *Boothe*, 2008 WL 281621, at *11-13.

The record demonstrates her ability to consistently take her pain medication. When she reported to Dr. Shelton in February 2012 that she was out of that medication, she did not provide an explanation, or at least he did not record it in his notes. (Tr. 242, 245, 255.) That visit also marked the end to the longest gap between sessions with Dr. Shelton; there had been no recorded visits since October 2011. (Tr. 188.) After that visit, she saw him nearly every month through May 2013, the last recorded session prior to the ALJ's decision. (Tr. 245-77.) While she sometimes complained of back pain in this period, she consistently reported improvements in her back pain and that she was compliant with her pain medication, though it was during this period that Dr. Shelton mentioned her noncompliance with her blood medication. (Tr. 245, 248, 250, 252, 254, 255, 258, 265, 267, 274.)

This is not to suggest she dissembled when she claimed indigency. Rather, it demonstrates the very point the ALJ made in his credibility analysis:[10] her treatment was

---

*Soc. Sec.*, No. 13-CV-15257, at *22-25 (E.D. Mich. Nov. 26, 2014) (adopting Report & Recommendation) (describing the application of *S.E.C. v. Chenery Corp.*, 318 U.S. 80 (1943) to social security cases). Plaintiff's ability to afford more procedures is largely irrelevant since, as discussed below, no one proposed such procedures.

[10] "The court may consider evidence in the record, regardless of whether it has been cited by the ALJ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012) (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.2001)). *Report & Recommendation adopted by* 2013 WL 53980, at *1 (E.D. Tenn. Jan. 2, 2013). The analysis that follows merely plugs additional facts into the ALJ's analysis, it does not construct new rationales or arguments for the ALJ's action.

"routine and conservative."[11] (Tr. 29.) Neither Dr. Shelton nor any other medical source recommended anything other than a conservative treatment course, consisting of medications, home exercise, and possibly physical therapy. Such modest treatment plans generally indicate that a claimant is not disabled. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011) (discounting medical opinion where the claimant received only conservative treatment); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 335 (6th Cir. 2007) (noting that the claimant's "modest treatment regimen . . . is inconsistent with a diagnosis of total disability).

It is true that if she could not afford a conservative treatment regimen, she could not likely afford an aggressive one. One court noted, the "ALJ['s] . . . reliance upon Plaintiff's routine and/or conservative treatment is troublesome because it is subject to the same criticism that plagued the ALJ's reliance upon Plaintiff's" noncompliance; namely that "if an individual is truly unable to afford 'conservative' forms of treatment, that individual would likely also be unable to afford more aggressive or advanced forms of treatment." *Gerhart v. Comm'r of Soc. Sec.*, No. 5:10-CV-2649, 2012 WL 1068986, at *6 (N.D. Ohio Mar. 29, 2012). But there one of the plaintiff's ailments was fibromyalgia, which is uniquely unsusceptible to aggressive treatment. *Id.* (citing *Kalmbach*, 409 F. App'x at 864); *see also Cooper v. Comm'r of Soc. Sec.*, No. 4:13-cv-11883, 2014 WL

---

[11] He also described it as "infrequent," though that is more debatable. She saw Dr. Shelton frequently throughout the relatively short period captured by the records. If using this adjective was an error, it cuts both ways. While it may suggest that the ALJ unduly downplayed the consistency of her treatments, it also shows that she could obtain medical services on a steady basis. And if the treatment was more frequent than the ALJ acknowledged, this oversight would strengthen his argument: even with more opportunities to treat Plaintiff, Dr. Shelton consistently recommended a conservative treatment course.

4606010, at *18 (E.D. Mich. June 11, 2014) ("[L]imited [treatment] plans are often the only option with fibromyalgia and courts are accordingly hesitant to use them as evidence of an ability to work."), *Report & Recommendation adopted by* 2014 WL 4607960 (E.D. Mich. Sept. 15, 2014).

Moreover, *Gerhart*'s observation might hold weight where financial constraints caused the claimant to forgo aggressive options proposed by his or her physicians. But when those physicians never recommend more complex procedures in the first place, an ALJ can justifiably conclude that the physicians deemed them unnecessary and that the claimant's condition is not as severe as claimed. It does not seem relevant that a claimant could not afford a treatment no one thought he or she needed. Indeed, half of the required regulatory factors for assessing credibility focus on the treatment a claimant actually received. 20 C.F.R. § 404.1529(c)(3).

Here, Plaintiff's physician never suggested she consider more intensive treatment. He remarked that she "could benefit from some physical therapy," but he did not indicate that Plaintiff needed cortisone injections or a surgical procedure for her back, and his notes fail to mention any referral to a mental health specialist.[12] There is no indication Dr.

---

[12] Plaintiff told the consultative examiner that she had been referred for counseling, but the referral is not mentioned in any treatment notes. (Tr. 190.) As a physician Dr. Shelton was qualified to provide psychiatric services in Michigan and thus could render competent medical evidence on Plaintiff's mental state. *See Antes v. Comm'r of Soc. Sec.*, No. 1:12-cv-1188, 2014 WL 1366465, at *11 (W.D. Mich. Mar. 31, 2014). In that case, however, the physician provided an opinion that concluded the plaintiff could not work, citing depression and anxiety as contributing factors. *Id.* at *10. The court rejected the ALJ's analysis, finding that the physician's lack of mental health specialization and failure to refer were not good reasons for rejecting his opinion the plaintiff's mental health. *Id.* at *10-11. Dr. Shelton provided no similar opinion here: he diagnosed both depression and anxiety but never opined how this would affect Plaintiff's functioning. Moreover, the Court is not now analyzing whether the ALJ here provided "good reasons" for rejecting a discrete mental health opinion; rather, it is measuring the depth of Plaintiff's

Shelton refrained from proposing such treatments because he knew they were beyond Plaintiff's financial capability. In fact, when she failed to take her blood pressure medicine, Dr. Shelton exhorted her to continue on the prescription. (Tr. 267.) Thus, the ALJ provided a valid rationale for discrediting Plaintiff's credibility.

But he did more than this, finding additional reasons for his credibility assessment, thus satisfying SSR 96-7p and providing substantial evidence for his conclusion. *Kittelson*, 362 F. App'x at 558; *Davis*, 2009 WL 2901216, at *1. In finding that she retained the ability to perform sedentary work—and that her impairments were not as severe as she claimed—he noted that he considered all of the evidence, including her allegations, agency forms, medical opinions, and objective medical findings. (Tr. 29.) His decision adequately canvasses these sources and his analysis supports his conclusions. (Tr. 25-29.)

He began by evaluating her mental health, noting that her daily activities suggested "no more than a mild limitation in social function" and her ability to concentrate. (Tr. 25.) This assessment accurately characterizes the evidence. In her Function Report, Plaintiff's description of her typical day included substantial social interaction with her granddaughters, ensuring they were ready for school and preparing meals for the household. (Tr. 157-58.) Her family was "very close," and only distance prevented her from more frequent contact with friends; nonetheless, she played games and generally enjoyed her time with family and friends. (Tr. 161.)

---

treatment. In this analysis, it is relevant that Plaintiff only received medication and no one suggested more intensive treatment. *See* 20 C.F.R. § 404.1529(c)(3).

Dr. Boneff's opinion also bolsters the ALJ decision. As the ALJ noted, Dr. Boneff discussed Plaintiff's independence in daily activities and her satisfactory social functioning; ultimately Dr. Boneff determined that Plaintiff was "not currently evidencing any significant psychiatric symptoms, depression, anxiety, or problems with memory or concentration that would prevent her for doing work related activities at a sustained pace." (Tr. 25, 192.) Dr. Morrow, the reviewing expert, opined likewise. (Tr. 86.) The ALJ also observed that Plaintiff had experienced no episodes of mental or emotional decompensation (Tr. 25, 28), and in fact Plaintiff told Dr. Boneff that she had never felt "hopeless" or "overwhelmed," and had never considered self-harm. (Tr. 191.) Even Dr. Shelton's notes, which included diagnoses of depression and anxiety, suggest that these conditions related to persistent grief after her mother's death. (Tr. 253, 264, 267.)

Regarding her claims of physical problems, the ALJ likewise examined her statements and the objective evidence. (Tr. 27.) His discussion of Dr. Shelton was addressed above; he also found support in Dr. Bedia's report, which failed to find any physical limitations after thorough testing. (Tr. 28, 195-202.) The ALJ noted that when Plaintiff's mother passed away, Plaintiff declined to seek employment because she was nervous. (Tr. 27, 40.) This constituted her "main problem now," she testified, ignoring her physical issues (Tr. 40); yet in her Function Report she claimed that her back pain was the main impediment to her ability to work. (Tr. 157.) In the earliest medical records, from 2010, Plaintiff denied experiencing any medical or psychiatric problems and said

60

she occasionally engaged in vigorous exercise. (Tr. 221, 223.) At the hearing, however, she said her back pain began while helping her mother turnover in bed, though her mother passed away in 2009. (Tr. 40-41.) These statements provided sufficient grounds for questioning Plaintiff's credibility.

For these reasons, I suggest the ALJ's analysis assembled substantial evidence to support his decision. Along with his observations about Plaintiff's conservative treatment, he considered Plaintiff's daily activities, objective evidence, and the consistency of her subjective statements. All of these are relevant factors in the credibility determination. 20 C.F.R. §§ 404.1529(c)(3); 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5. Thus, Plaintiff is plainly mistaken when she grouses that the ALJ "never rejects any of [her] . . . complaints because they are simply never discussed in the decision." (Doc. 13 at 14.)

She adds that at the hearing the ALJ stated he "believe[d] her" (Tr. 66), and therefore he inexplicably switched course after the hearing. (Doc. 13 at 15.) But her attempt to pin the ALJ to this off-the-cuff remark is unconvincing. First, she points to no authority that such comments bind the ALJ in his or her subsequent written decision, where a reasoned explanation for the credibility assessment is to be given. But more importantly, in stating Plaintiff seemed credible, the ALJ was explaining why her case nonetheless appeared weak. "[W]e have two consultative examinations . . . which basically are close to normal," he explained, adding later, "I understand that she's very credible . . . but we have to deal with the lack of medication and the effect of it." (Tr. 65-

66.) His comments, then, did not commit him to any particular credibility determination. His written decision describes his reasoning and is supported by substantial evidence.

### d.      SSR 96-8p's Narrative Discussion

Tucked at the end of her credibility argument, Plaintiff includes a brief paragraph block quoting SSR 96-8p and concluding, "Curiously, the ALJ never complied or even attempted to reconcile Social Security Ruling 96-8p with his decision." (Doc. 15-16.) SSR 96-8p "establishes narrative discussion requirements that force ALJs to explain and justify their RFC." *Gilliam v. Comm'r of Soc. Sec.*, No. 14-12335, 2015 WL 3580502, at *17-18 (E.D. Mich. June 5, 2015) (adopting Report & Recommendation). Under the Ruling, the ALJ must canvass the relevant evidence, explain any inconsistencies, and provide a "thorough discussion" and "logical explanation" of how a claimant's symptoms affect his or her capacity to work. SSR 96-8p, 1996 WL 374184, at *7.

Plaintiff does not explain how the ALJ disregarded this Ruling. Her argument seems to relate to her credibility argument, in which she accuses the ALJ of "severely mistat[ing] and misquote[ing]" Plaintiff. (Doc. 13 at 15.) She does not, however, provide any examples of these misstatements. She continues, "The ALJ decision [sic] defies logic. There is never any explanation for the ALJ credibility [sic] decision" and it seemed to contradict his statements at the hearing. (*Id.*) Again, she fails to flag the logical fallacies riddling the decision. As for the ALJ's hearing statements, as discussed above those do not indicate that he changed course. Overall, his decision considered the evidence, including Plaintiff's testimony, and found that the objective measures indicated

her impairments were less severe than claimed. I suggest that substantial evidence supports this conclusion and that the ALJ did not violate SSR 96-8p.

### e.      The RFC

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless [she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [she] can still do despite [her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). The Plaintiff bears the burden of proof during the first four stages of analysis, including proving her RFC. *Jones*, 336 F.3d at 474; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). At step five, the Commissioner does not have add anything to the RFC, 20 C.F.R. § 404.1560(c), and consequently the burden to prove limitations remains with the Plaintiff at this stage. *Roby v. Comm'r of Soc. Sec.*, 48 F. App'x 532, 538 (6th Cir. 2002); *DeVoll v. Comm'r of Soc. Sec.*, 234 F.3d 1267, 2000 WL 1529803, at *3 (6th Cir. 2000) (unpublished table decision); *Her*, 203 F.3d at 391-92. The hypothetical the ALJ propounds to the VE is valid if it includes all credible limitations developed prior to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

Plaintiff adds two cursory arguments attacking the RFC. In its entirety, the first reads:

> [The ALJ] does not factor in his RFC determination his previous conclusion that Ms. Houston suffers from degenerative disc disease; hypertension; and swelling of the bilateral lower extremities. ALJ Blum never states what limitations Ms. Houston suffers from her severe impairments and limitations. There is not one single functional limitation in ALJ Blum's RFC. The ALJ does not evaluate Ms. Houston's pain or any other symptoms whatsoever in his decision.

(Doc. 13 at 14.) A glance at the ALJ's decision dispels the concerns Plaintiff raises. By limiting Plaintiff to sedentary work, the RFC does contain a host of relatively restrictive functional limitations. (Tr. 26.) For example, the ALJ found that she cannot lift more than ten pounds and can only walk or stand occasionally. 20 C.F.R. §§ 404.1567(b), 416.967(b). Consequently, Plaintiff is incorrect that the ALJ "never states what limitations Ms. Houston suffers." (Doc. 13 at 14.)

What Plaintiff likely meant was that the ALJ did not include enough limitations in his RFC to render her disabled. But she never puts forward any additional limitations that the ALJ missed or explain how these limitations could be divined from the slim evidence she offers. The objective evidence supporting her mobility restrictions is one positive straight leg test and a few of Dr. Shelton's boilerplate observations that she had "Limited Motion :- Muscle Spasm :- Arthritis :- Gait & Station : mild stooped gait." (Tr. 189, 243, 246, 249, 251, 253, 256, 260, 263, 266.) Leaving aside the persuasive evidence to the contrary, Plaintiff fails to explain how her proffered evidence demonstrates, for example, her inability to walk or stand even occasionally. And if this somehow constituted

substantial evidence supporting her disability, the ALJ nonetheless cited to substantial evidence supporting his decision, and would therefore fall within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545).

Plaintiff's second argument focuses on the ALJ's failure to find that her anxiety was a severe impairment at Step Two. (Doc. 13 at 14.) She asserts, "There is no explanation whatsoever from the ALJ on his conclusion that Plaintiff's anxiety is not a severe impairment." (*Id.*) For her part, Plaintiff does not explain why it constitutes a severe impairment. In any case, the ALJ did not, as Plaintiff suggests, arbitrarily determine her mental conditions posed only mild limitations. He prefaced his analysis in Step Two by stating, "As discussed in more detail below." (Tr. 25.) In the body of his decision, explaining the RFC, the ALJ discussed the relevant evidence, including her daily activities and Dr. Boneff's psychiatric evaluation. (Tr. 27-28.) Even within his Step Two section, the ALJ offered support for his conclusion by citing and discussing Dr. Boneff's conclusions. (Tr. 25-26.)

As noted, Dr. Boneff found no significant psychiatric issues, and a reviewing psychiatrist agreed. While Dr. Shelton, a physician, was competent to opine on Plaintiff's psychiatric state, see *Antes v. Comm'r of Soc. Sec.*, No. 1:12-cv-1188, 2014 WL 1366465, at *11 (W.D. Mich. Mar. 31, 2014), he failed to explain how Plaintiff's anxiety affected her functioning. His "Examination Report" noted the anxiety diagnosis but made no other comment about her mental status. (Tr. 189.)

Further, his notes on this impairment are thin. Aside from the diagnosis, the medication prescription, and a few observations that Plaintiff appeared in distress, his notes only offer one explanation of her anxiety. *See, e.g.*, (Tr. 242, 246, 249.) This explanation, repeated verbatim across numerous session notes, simply reported that Plaintiff expressed continuing grief over her mother's death. *See, e.g.*, (Tr. 253.) This reflects her comments to Dr. Boneff. (Tr. 191.) Considering this evidence, as well as Plaintiff's comments denying mental health issues—or specific manifestations of those issues, like feelings of hopelessness—the ALJ favored Dr. Boneff's opinion. (Tr. 25-26, 28, 191, 219, 223, 237.) I suggest that his decision is supported by substantial evidence, as it reflects the considered opinion of the only mental health specialist to examine Plaintiff.

Any error in his Step Two analysis would be harmless. Once Step Two is "cleared" by a finding that some severe impairment exists, the ALJ must consider a plaintiff's "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008). "The fact that some of [Plaintiff's] . . . impairments were not deemed to be severe at step two is therefore legally irrelevant." *Id.* The ALJ here explained that in constructing the RFC, he had to "consider all of the claimant's impairments, including impairments that are not severe." (Tr. 24.) This he did by considering Plaintiff's statements and Dr. Boneff's opinion. (Tr. 25-28.) Consequently, if he erred at Step Two, the error would be "legally irrelevant." *See Anthony*, 266 F. App'x at 457.

66

### f.    Waived Issues

Plaintiff hints at an additional argument in her brief, but without enough detail to construct an actual claim. When issues are "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation," they are deemed waived. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir.1997). This district has found that when a party's brief is "completely devoid of any discernable legal argument" the plaintiff's motion should be denied since the only argument in it has been waived. *Burger v. Comm'r of Soc. Sec.*, No. 12–11763, 2013 WL 2285375 (E.D. Mich. May 23, 2013). "It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to ... put flesh on its bones. *McPherson*, 125 F.3d at 995–96.

Plaintiff seems to suggest that the ALJ should have recontacted Dr. Shelton. (Doc. 13 at 12.) She states, "When evaluating the opinions of treating physicians, the ALJ must consider, under some circumstances, contracting the treating source for clarification." (*Id.*) She then block quotes from a Social Security Ruling discussing recontacting treating sources, cites a few cases with parentheticals that discuss the ALJ's duty to investigate facts, mentions that remand might be required if the ALJ does not provide "good reasons" but nonetheless cites substantial evidence, and ends by suggesting that even if Dr. Shelton is not entitled to controlling weight the "outright dismissal" of his opinion was unwarranted. (*Id.* at 12-13.) Thus, it is unclear that Plaintiff is asserting the ALJ erred by not recontacting a medical source. She neither makes that claim explicitly nor

constructs an argument on the matter. Consequently, I suggest she has waived this claim.[13]

### G.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is supported by substantial evidence.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit*

---

[13] To the extent it was not waive, it would fail. Under new regulations promulgated in 2012, the decision to recontact is discretionary and courts have subsequently emphasized that an ALJ generally is under no obligation to recontact sources. *See Hollis v. Comm'r of Soc. Sec.*, No. 13-13054, 2015 WL 357133, at *23-24 (E.D. Mich. Jan. 27, 2015) (adopting Report & Recommendation). Plaintiff has not described how the present evidence is insufficient for the ALJ to decide the case.

*Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  August 25, 2015                S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge




**CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: August 25, 2015                By s/Kristen Krawczyk
                                     Case Manager to Magistrate Judge Morris